Our sixth case for this morning is Derry v. Berryhill. Mr. Goode. Mr. Goode May it please the Court, Your Honors. My name is Sean Goode, and I have the privilege of being the voice for Ms. Jacqueline Derry before you today. As you read in the briefs, Ms. Derry is a Navy veteran. She served for more than 22 years. She has a disability rating of 90%. Inexplicably and improperly, the administrative lodgers in this case found the disability rating and, more importantly, the underlying evidence that supported it to be irrelevant. The district court should not have affirmed the ALJ's decision. It applied an overly deferential standard of review, which essentially put it in position to rubber stamp this deficient decision. Ms. Derry never asserted that the ALJ is required to accept the VA's disability determination, but it should defer to it where it is supported. So what exactly do you think that means? I mean, obviously the ALJ is aware that the Navy has made this, or the VA, has made this determination, and so we have, you know, a situation of, you know, I'm just trying to figure out what would have been the right thing to say? Like I've considered the VA's records, but I'm not persuaded that they accurately depict her condition, or, you know, what, what, um... Well, I think looking at individually the doctors and what they write is important, okay? And, for example, Dr. Dang is Ms. Derry's long-time treating neurologist. She ordered an MRI that was done on August 17, 2012. That MRI of her brain showed nonspecific foci in the white matter. It was read by radiologist Mark Connelly. Mark Connelly said that it could cause, or it could represent lesions that cause migraines. Then in a later disability exam, Dr., another neurologist, Dr. Hazelrig, who the ALJ said was too vague to give specific weight, said he reviewed the records. He didn't exam. He listed her symptoms of constant throbbing, pulsating pain in one or both sides of the head, increased pain with physical activity, nausea, vomiting, sensitivity to light and background dizziness, diarrhea, and then he notes that the MRI is consistent with migraines. I do not see how this opinion is too vague. That is the problem with this decision. This is not the logical bridge that is required. This opinion is not vague. It's four pages long. It's not vague, and it's certainly not a snapshot, which is, I think, another thing that's said. Well, I've kind of thought about the snapshot thing a lot, and every opinion is a snapshot because basically the disabled do not have doctors walking around them all day taking notes. They see a doctor once a week, once a month. They're all snapshots. You put a bunch of snapshots together, and you basically have one of those mosaics with a picture, and this picture is a woman who's disabled. So on that point also, the defendant cites Cleveland versus Colvin to support their position, and that's a case where the district court said that the VA's findings were not appropriately ... They weren't accurate, so they shouldn't be applied to her disability case, her Social Security case, and basically in that case, the plaintiff gave what was proven false testimony. There was one doctor supporting it, and then there was another doctor whose exams and treatment conflicted it. In this case, there's seven doctors at the VA who conducted disability exams, and according to the ALJ, again, she says that it's based heavily on subjective symptoms. But the doctors all corroborate one another, these various VA doctors. Not one of them says she's not disabled or can work. So you'd have to imagine some gross level of medical incompetence or worse not to give some weight to that. I mean, the reasons she gives are just wrong. It's not based on her subjective symptoms. It's based on this three doctors' review of MRIs and treatment history and hospitalizations. She's had four ER visits. She has an occipital nerve block. Her doctor was going to give her a Botox injection, which she's had over a dozen of, and he said, I can't give this to you today. You're going to the ER. I'm going to get you an occipital nerve block, which is a long needle they stick in the back of your neck and inject fluid, so you basically go numb in your face. So the reasons that the judge articulates are simply false. They do not make sense. Well, subjective symptoms are not automatically inadmissible anyway. No, and they're supported here. I mean, you have three doctors who say this MRI is consistent with someone who has headaches. I mean, it's not like she's never been to the ER. The judge really, in my opinion, revealed sort of her intent behind the decision at the hearing. And she said to hearing counsel that basically the biggest stumbling block in the case was Ms. Derry's trips to Florida. And then in this case, she highlights five trips, or no, five missed appointments where she claims Ms. Derry was in Florida. But the problem with that is, as I'm sure the court's aware, there's severe impairments and non-severe impairments. And the VA found that her impairments of her hands and her feet, the tendinitis, were non-severe impairments. So when the judge articulates five times at page 30, at 35, at 38, 39, at 41, that she missed appointments for physical therapy for non-severe impairments, somehow that cuts against her credibility. That's like saying you missed five dentist appointments. Therefore, your migraines, PTSD, anxiety, and depression are not disabling. They're simply irrelevant. What was the testimony about her trips to Florida? What does the record show as to why she made them and at whose initiative they were made? So Ms. Derry's from Florida. She actually was sort of transplanted here from the military around 2006. She bought a house. And then, of course, the housing crisis happened. So then she's underwater on her house. Her whole family's in Florida, her brother, her mother, her sister, and her father. And she testifies at page 81 that if she wasn't underwater on her house and worried about foreclosure, she'd be living in Florida. And this is referenced in the medical records at page 733 and 1870. Wasn't it also, too, that she wants the consistent medical care and the familiarity of the doctors that she has in Chicago? That's very true, even though the consistency of the VA is never very... Right. I mean, you know, I mean, her favorite doctor, who was Laura's son, you know, retired. And basically, Lisa Story, her psychologist, treats it as if a parent's dying. She tells her to grieve over Lisa Story leaving the VA. I mean, you know, I do want to say, though, you know, there is somewhere that she said there's some medical record that says that she went there to take care of her mother. And then at court... But that leads back to Judge Ripple's question. What does the record show? I have a sense of some conflict, whether it's she goes down to Florida because her family's She goes down to Florida because she likes hiking. She testifies that it's... They're going to take care of her. I mean, Lisa Story, her longtime treating social worker, her psychotherapist, at page 413, tells her it'd be good to go there. Because no reasonable person's going to say when you're mentally and physically not well, yeah, sitting alone in isolation away from your family and your support network is a good idea. This... Does she have any idea about her family being concerned and there at least being suicidal ideations? Yeah. She's been hospitalized in the past following some military legal trouble about suicidal ideation that she had. And was that a motivation for her family to want her in Florida? Yeah. They actually came and picked her up. Testimonial to that effect? Yeah. They actually came and drove and picked her up because they were so concerned about her. And that's sort of one of the weird things about this, because I talked to her on the phone. I said, can you tell me what days you were there? And she said, no. Because it's not like she can go look at the past plane tickets. You know? They just went and picked her up. So... The matter is, these trips to Florida may well not have been her lollygagging, staying away from the VA because she wasn't interested in following through on her care. She did follow through. I mean, there's more than 300 points of contact with the VA for treatment. For physical therapy, for occupational therapy, for psychotherapy, for ER visits, for Botox injections. I mean, the defendant claims they painstakingly and thoroughly cataloged this record. I did it into an Excel spreadsheet. There's 324 points of contact with the VA. There's really not much gaps in treatment. The district court said that there's sort of a lull in her treatment visits, but it really peaks in like 2014, I think, by my analysis. So I'd like to save the rest of the time for rebuttal. Thank you, Your Honor. That's fine. Thank you. Mr. Budde? May it please the Court. My name is Stephen Budde on behalf of the appellate acting commissioner. The ALJ recently considered the evidence in this case and acted within her discretion in weighing that evidence. She gave substantial weight to the opinions of the early doctors who offered function-by-function assessments of the claimant's abilities. But I don't know that she did. She brushes off quite a few doctors for reasons that seem perfunctory, I guess I'll say, saying, oh, well, so-and-so just had a snapshot, whereas any medical appointment is going to report how you are as of that day, but it comes against a backdrop of where you've come from. I would say that some of those opinions are very, certainly, cursory and brief. There's one opinion from Dr. Sun that she can't seek work because of her concentration issues. That's not technically an opinion under SSA's definition, an opinion on an issue reserved to the commissioner. Well, the commissioner gets all fussy about how doctors phrase this, but sometimes the doctors are really just trying to describe, you know, how many hours a day can you be active? You know, a doctor could say that. Now, if the doctor made a mistake and said, and that means you can't work, the commissioner really just needs to excise that and not worry about that last phrase. But she's constantly at these doctors. She's got Dr. Sun. She's got, you know, the therapist, Story. She's got various other people, Belsky. She's got Dang. She's got, you know, just over and over, she's got people. She's got a symptom that doesn't look like, you know, measles. You know, it's not like you break out in a red rash all over your face, you know, when you're depressed or when you have PTSD or when you have a migraine. It's kind of invisible for other people, so you just have to say to somebody, I have a migraine or, you know, I'm panicking or something. Yeah. We don't dispute that she has severe impairments and the ALJ, of course, assesses significant limitations to account for them. But her impairments, what the ALJ fails to do is look at the full history of what goes on in terms of her treatment through the VA. You know, like all veterans, she's entitled to that, and that's where she's getting her treatment. And the ALJ seems to think that subjective reports can't be relied on, which is just an error of law. They certainly can be relied on. Doctors always rely on a combination of the subjective and the objective testing. But I think one of the points is that objective findings are still relevant, and when subjective findings aren't substantiated by any objective findings in general, they aren't. But they are. She's got the MRI showing the spots in the brain that might lead to the migraines. Other people may have headaches without spots, but it's not that you can't have a headache unless you have something detectable by an MRI. Yeah, and again, we don't dispute that she has headaches, it's just the issue is what functional limitations do those headaches pose to her. Right, so if you have a couple of migraines a week, and you're in a light-sensitive, sound-sensitive thing where you have to shut yourself up in a black room, I bet a vocational expert would say you can't be in the workforce. But there's not evidence that that specific limitation is present for this claimant. I mean, there are opinions from... But that's typical of migraines. There are opinions from the agency doctors that assess her functional capabilities, and ALJ accredited those, gave them significant... They don't examine her, even. They're just reading the file. They don't examine her, but there are no examiners... These are mental limitations. How can you possibly do this? Well, there were no opinions from her doctors assessing specific function-by-function limitations. So you generally say she has migraines, they report some symptoms, but they don't make an assessment of what she can still do despite those symptoms. So what about... What about Thafford in 2014 and Zaror, who say they document persistent symptoms of depression, military sexual trauma, PTSD, neurovegetative symptoms, distorted thinking, distorted perception of events, psychomotor retardation, sleeping during the day, distorted thinking, difficulty prioritizing, and not able to change too much. I mean, these are specific functional things. They're talking about. Why is this a record where there isn't that? Well, they're not like work-related functional capabilities, like besides these symptoms. What? Prioritizing objectives is not work-related? Says who? Well, I don't think there are specific statements about what she can still do despite her impairments. They don't say what she can still do. They say if she has symptoms. Against those symptoms, ALJ considered that the objective findings in the record are almost entirely normal for mental status objective findings. I mean, she reports symptoms. But they're irrelevant, too. I mean, I don't know what you mean, objective findings about her mental status. They'll talk about her concentration, her attention, her insight and judgment. Right. She wants to commit suicide. Is that good insight? Certainly not. That wasn't... That was before the adjuvated period, before the ALJ was not part of the period the ALJ was looking at. She wasn't claiming disability during that period. There's also the opinions of the reviewing psychologists... The ones who never saw her. ...who never saw her. But they did review these records, and they have some expertise in assessing functional abilities for Social Security. And their opinion is that she retained the ability to do a reduced amount of work. But you're talking about a really subtle thing. How well can somebody prioritize? How much is their concentration, persistence and pace, as you guys like to say, affected? I don't know how you can make that qualitative judgment based on reading somebody else's note that says she has trouble with it. It's not that the note said, it's fine. If the note said, it's fine, then okay, it's fine. But the note says she has trouble with it. So how do you get that ranking of how bad the trouble is by reading the file? Well, I think taking the file as a whole, there are some notes that she has trouble with this issue, this area, and the ALJ acknowledges that. But there are other notes that says attention and concentration are fine, and the majority of findings do say that when you look at the record as a whole. I mean, ultimately this is a judgment call, and the judgment is reserved to the ALJ about her functional capacity. And the ALJ is informed by this evidence, but ultimately the determination is up to the ALJ to decide. And the ALJ thinks she's successful in her efforts of going to college, but she can't make it to a four-year thing. She finally finishes up with an associate's level. She has trouble even doing that. She spaces that out considerably to finish. So the ALJ's notion of success would be like saying, I've hired you to work for a week, but I'm going to give you three weeks to do it. Most employers don't do that. I think the larger point is that her allegations of such extreme limitations aren't necessarily consistent with the ability to actually complete this program. Over a longer period of time than other people need. Is that what the vocational experts said the employers would tolerate? Giving her twice as long to complete jobs? No, but I don't think there's evidence that she needs twice as long to complete tasks. There's plenty of evidence that her attention and concentration is normal. Mental findings are normal. There are two opinions from psychologists. There are no constitutory opinions. So when you say mental findings, you mean like being able to do serial sevens? That would be an example, but just... Which seems to me irrelevant to PTSD. On the mental status examination, there's usually a series of findings like appearance, speech, attention, concentration, insight, and judgment. And the majority of those examination findings, despite her reports of symptoms, were normal. Did they pick up headaches? I mean, you could be very beautifully dressed and have a migraine headache. There are findings... I mean, there's certainly diagnosis of headaches, there's evidence she has headaches, but what's missing is really a doctor's report saying what she can still do despite her headaches apart from the state agency reports. But you would reject that because you would say the vocational consequences of the headaches are an issue for the commissioner, not for the doctor. So you would scold the doctor for writing something like that. Not necessarily. I mean, that would be relevant evidence the ALJ is required to consider. I wouldn't say the ALJ would have to accept it, but that's some evidence that's just missing in this case. I mean, you have to feel for these doctors because they're going to be scolded if they write down something that you're looking for, and they're going to be criticized for not writing it down if they don't write it down. Well, I think that one point I make is obviously the court only sees the cases that are denied benefits. There are other cases where the ALJs will credit medical opinions, find disability. Even in this case, there are some doctors that actually opined that the claimant had no physical limitations. The ALJ discounted their opinions because she found limitations. So this isn't a case where the ALJ was one-sided. She considered evidence on both sides, and ultimately the conclusion she arrived at was within her discretion. My time's running out here. I will just... I think the core point is that the ALJ has significant discretion in weighing record evidence and making judgments about that evidence. They had to reasonably weigh the evidence and support their conclusions without breaking the record, and we respectfully request that this court affirm the decision. All right. Thank you. Final words, Mr. Goode? Ma'am, please, the court. I just want to talk about two things. First is her education. So going back to school doesn't mean you can do a full-time job, and I think it's important that we talk a little bit about what she did in school. So as the ALJ says at page 32, she tried to minimize her going back to school. But what the ALJ fails to mention is Ms. Derry has a master's degree in human resources. She went to get back to school to get a master's degree in teaching. She walks out with an associate's degree in human resources, the same degree she has a master's in, or the same field of study, rather, and she goes through with a program for people with disabilities where she's given more time. The second thing I wanted to point out is that there's plenty of errors on... At page 800, there's notes about errors on her serial sevens, which is pretty simple subtraction. And these doctors do not take notes for Social Security to review them. They take notes to try to treat patients. So they don't give a residual functional capacity at every look at a patient. They treat the patient. They try to get the patient better. So this decision was not supported by the adequate logical bridge. I mean, these opinions were not vague. The ALJ cites and gives great weight to the two doctors, the non-treating doctors at DDS. She cites all of 1A and all of 2A, or 3A, excuse me. That's 22 pages. Could she pick something more specific? I think that's vague. So on behalf of Ms. Derry, we request you reverse this decision and award benefits. Thank you, Your Honors. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement. Thanks.